People of the State of Illinois, Plaintiff-Appellee, v. David Littleton Rollins, Defendant-Appellant.

Gen. No. 11,068.

Fourth District.

January 26, 1970.

118

CRAVEN, P. J., dissenting.

John C. Tucker and John G. Stifler, of Chicago (Raymond, Mayer, Jenner & Block, of counsel), for appellant.

Basil G. Greanias, State's Attorney of Macon County, of Decatur, for appellee.

SMITH, J.

Appeals involve, as we know, a review of errors said to have been committed by the trial court. However, not every error will be reviewed—*generally* only those that have been committed wittingly, so to speak. This means that somehow the happenstance complained of must have been brought to the attention of the court, for in many instances this gives it an opportunity to avoid or otherwise obviate the mishap. A common way

of doing so is by objection, ideally, ahead of time, but in any event, at the first opportunity. But, a party can waive erroneous (in his view) happenings and he does so by not objecting. Take the rule against hearsay. A party might wish to waive it in a given situation. He does so by doing nothing. Conversely, if he opts to enforce the rule, he signals his nonwaiver by objection, thus giving notice of an issue of law and its terms.

But this is not precisely our problem. Here, we are asked to remand for errors which would *generally* not be reviewable because they were not brought to the attention of the trial court, at least at the time they should have been. We say "generally," however, because if the errors are plain and they affect substantial rights we can indeed notice them and act thereon. The occurrences now complained of, other than as to two instructions, passed unnoticed at the trial. They are said to be "plain error."

The statutory definition of the rule reads:

> ". . . Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill Rev Stats 1967, c 110A, § 165(a), Supreme Court Rule 615.

As is apparent, the "plain error" rule has the effect of giving a defendant the right to get his foot in the door for appellate review even though the happenings as to which he feels aggrieved were not "perfected," "saved," or "preserved," as it is said. We make this statement not to question the wisdom of the rule but rather to emphasize that its invocation will be effective so far as we are concerned only when the happening *really* is plain error and *really* does affect substantial rights and is capable of causing a miscarriage of justice. In supplying the adverbs, we do not change meaning,

rather supply it. If we do not articulate the rule in this fashion we debase the system. Without belaboring the point the administration of public justice is not subserved by new trials, the more so when the errors that might command just that could have been avoided—say by letting the court in on it at the time. Our procedure contemplates a single occasion—one trial—not successive occasions until the perfect-error-free trial is achieved. What is more, the rule that errors must be preserved, saved or perfected, works against a tactic lamentably still extant when a defendant's only interest is in "collecting error" for use here if the result goes badly. We would not want to be a party to giving aid and comfort to those so inclined by inadvertently broadening the rule to the point that error, not amounting to plain error, can be collected in silence and then be used to obtain that second occasion, which, as we have said, should be eschewed. In saying this, we are not implying that such was the case here. At this juncture, the observations of Judge Learned Hand in United States v. Brown, 79 F2d 321, 326 (2nd Cir 1935) is most apt:

> "When the very merits of the case are clear; when only one result can honestly emerge; and when the jury has in fact been satisfied, we no longer look upon criminal procedure as a sacred ritual, no part of which can be omitted without breaking the charm. Trial by jury is a rough scales at best; the beam ought not to tip for motes and straws."

With this foreword we take up the matter before us —an appeal from a conviction of burglary. The facts can be succinctly put. Defendant attended an all-night beer party at a friend's apartment where it was decided to procure a television set from a nearby house conveniently vacant for the weekend—this happened early Easter morning. The set was indeed obtained. Five boys were involved, three did the actual breaking and

entering, one stayed out in front, and defendant in back. After the three reappeared from the house with the television, all five returned to the apartment. Whoever instigated the adventure, or rather misadventure, had forehandedly telephoned the house just to make sure that it was empty. All of them knew this. The intake of beer had been considerable and no doubt contributed to an omnipresent lack of self-restraint, to put it mildly. Indeed, as to one, constraint was *passé* he had passed out and luckily missed what turned out to be not very much fun at all. Defendant gave the police a statement which differed very little from the above recitation and his testimony at the trial. The same can be said as to his two codefendants—who do not appeal—and as to the one who became a so-called accomplice witness. The defense was lack of intent—in short, a prank.

The first point urged—and for outright reversal—does not involve the plain error rule as might be expected after all we have said. It involves the very charge itself. Here for the first time (other than in the post-judgment motion) it is argued that the information failed to charge the requisite intent necessary to sustain a conviction, specifically, that the information failed to charge that defendant intended to promote or facilitate the burglary either before or during its commission by aiding and abetting the others in its commission.

 We will assume as basic that one can't be convicted of an offense not charged. The point can certainly be asserted at any time. The information charged that defendants "entered without authority a building occupied and possessed . . . with intent to commit therein a theft"—an adequate charge for burglary. Defendant in arguing its inadequacy states that the proof showed him to be, at best, an aider and abetter and refers us to § 5-2 of the Criminal Code, Ill Rev Stats 1967, c 38, § 5-2, which, he says, requires a more expanded intent

for those who are "mere" aiders and abetters. Such section reads:

"A person is legally accountable for the conduct of another when:

". . .

"(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. . . ."

Assuming proof of the intent called for in this section was necessary to support the conviction, does it have to be set forth in the charge? In other words, assuming that he was an aider and abetter, was he convicted of an offense not charged?

This section is not a definition of a particular crime, rather it is a statement of when one can be held criminally accountable—it relates to parties and when they are responsible. Even if an aider and abetter, defendant can still be charged, tried and convicted of the crime he aids and abets. Simply put, there is no such crime as being an aider and abetter. All section 5–2 does is to make one who does aid and abet a burglary— a burlgar! It is not descriptive of any offense. It is descriptive of conduct which can render one accountable for crime. By emphasizing the physical aspects of burglarious conduct defendant sloughs off the plain purport of this section which makes it clear that one can be physically absent while a crime is being committed and yet be as guilty as those on the scene. That proof of the intent called for in § 5–2 may be necessary to support a given conviction, is not saying that such intent must be set forth in the charge. To support a conviction on a charge of burglary it is enough if it is shown

124

that the one convicted was a so-called aider and abetter of that offense.

The first "plain error" complained of occurred with regard to testimony concerning defendant's statement—or confession—to the police. In narrating the circumstances the officer testified that he informed defendant of his rights, that his father who was present telephoned his attorney, after which defendant "hesitated" and then talked. In argument, the State's Attorney pointed to this as consciousness of guilt:

> "He hesitates. He doesn't want to say about his involvement because he knows it shows he is guilty of the crime charged."

There was no objection as to any of this. The argument goes that this evidence and the excerpt from the argument was so highly prejudicial that they amount to plain errors which we can therefore notice, as they affect substantial rights of a constitutional nature and that being eligible for notice, we have naught to do but to do so and then remand for a new trial.

Now the "hesitation" is, as we all know, a mere conclusion and probably, if there had been an objection, satisfactorily dealt with. The same may be said as to the telephone call to counsel and the argument set out above. One wonders, however, whether evidence of "hesitating" before talking to the police or preceding such by a call to one's attorney really does raise the inferences defendant says they do. The State's Attorney apparently thinks so too, as he argued just that as we have seen. But arguing that it does, either there or here, doesn't make it so. What might be said in favor of defendant's position if he had refused to talk is beside the point. The fact remains that he did and he repeated what he told the officer upon the stand. It is, therefore, hard to read into this context the inflammatory infer-

ences said to arise from these trial events. Cases are cited to us of comment on an accused's failure to testify or to cooperate with the police. Such are not germane. We deal only with this case, not an infinite variety of single instances. Strain as we might, we cannot say that in these occurrences there was "plain error" that we can notice, much less use as a basis for a remand. "Hesitation" raises, in our mind, inferences pro and con—at least in *this* case it does. Even if we could characterize these happenings as error, the error is very far from being "plain."

Plain error, too, we are told, involves the admission into evidence of matters that occurred long after the "commission of the alleged burglary." These have to do with testimony that "the defendant unlocked and opened the door when . . . the others arrived back" at the apartment, that he helped carry the television back to the apartment, or that if he did not, he was present with those who did, and evidence that the accomplice-witness attempted to sell the set. The argument goes that defendant was charged with burglary, not theft and that anything that occurred subsequent to the breaking and entering is immaterial. This evidence, commented on in argument, heightened the prejudice, or so it is said.

 Burglary by definition is the breaking and entering with intent to commit a felony—here a theft. The best way we know to show this intent in the minds of those who break and enter is to prove the crime of theft itself. Theft encompassing the idea of permanent deprivation and asportation, as the older cases phrase it, or removal of the object of the theft, is certainly one way, if not the best way, of proving just that. Indeed, what could be more probative of an intent to commit theft here than the removal of the television set from the owner's house to the apartment whence defendants had just come and, so, too, proof of the television's ul-

timate disposition—sale? Proof of an intent to deprive an owner of a given article would include proof of the article's sale and anything in between. There was a "consensus"—defendant's own word—thus a common design to obtain the set and the rule is that where such exists the acts of one become the acts of all who were part of such "consensus." The evidence complained of was properly admitted, thus, again, there was no error at all—much less was it plain.

The next point has to do not with the admission of evidence but rather its exclusion. Again, there was no objection and no offer of proof—though one can easily conjure up its content had it been made. The asserted restriction relates to defendant's character witnesses. An attempt was made to show the witnesses' acquaintanceship or knowledge of the defendant "to substantiate the basis for their opinion as to defendant's reputation in the community." Objection to such line of inquiry was sustained.

 The only basis that a character witness need have is that he know the defendant's general reputation for the relevant trait. It would not be objectionable in most circumstances to permit elaboration on how this knowledge was obtained, but such is certainly discretionary—particularly as to the offering party. Since the witnesses did state that they knew—that is enough. An adverse party can test this by cross-examination. The fact that it was not so tested furnishes a basis for a contraargument—that the witness' knowledge was sufficient. An important aspect of reputation testimony is that the witnesses' knowledge is not based upon particular acts or specific instances. Reputation is what a community thinks of a person. A character witness does not give his "opinion" as to somebody's reputation. Reputation is a fact. Does the witness *know* it or not? It is not "opinion" testimony, which in most instances does

call for substantiation. Characterizing proof of this kind as "opinion" testimony may have led to defendant's confusion. The limitation imposed was eminently proper.

 The "plain error" most relied upon involves opening argument. It is said that this error, together with the others, created an atmosphere in which the prosecution perverted the presumption of innocence and sought a conviction "by any means or device at any cost." Specifically, it was stated in argument, that the "prosecutor, ignoring the most basic tenets of Anglo-American jurisprudence, announced to the jurors that unless they returned a verdict of guilty, he would bring charges of misconduct against each and every one of them." This is the excerpt from the argument so arraigned:

> "Everyone that is guilty of an act in violation of the law, stands in utter disregard for the law . . . a juror that fails to do anything other than to convict those individuals is guilty of a breach of trust, of misconduct as a juror. And I would charge every one of you—each and every one of you with that offense if the verdict in this case were not guilty."

There was no objection. In fact, during the whole argument covering six pages of the record there was only one objection and it concerned a quibble as to cost. But now in the cool aftermath of appellate review, this statement is seized upon as bringing the "trial atmosphere into clearest focus" and is likened with "denunciatory fervor" to the 12th Century writ of attainder—a device used by judges to coerce verdicts until the 17th Century. Now, defendant says, the State's Attorney "would turn the clock back a long way indeed," in that his "threat" to charge the jurors with misconduct "if they returned a verdict of not guilty . . . differs only in degree from the efforts to achieve the same result by the threat of writ of attainder, imprisonment or a fine."

128

In another context, where a Commission was likened to the Star Chamber of the Stuarts, Mr. Justice Cardozo thought that historians might find "hyperbole in the sanguinary simile." See Jones v. SEC, 298 US 1, 80 L Ed 1015 (1936). We feel the same way. Somewhat abashed at the "denunciatory fervor" visited upon him, the State's Attorney says we should read the whole argument, text in context, and that if we do so, the excerpt objected to takes on a different flavor. It is not amiss at this juncture to note that between the court and two defense attorneys no one construed the statement to mean what it is said to mean now. We say this because if even remotely it could be considered a threat, certainly the court would have interjected itself, to say nothing of counsel. We would even say in this day and age that if even momentarily the construction now placed upon this paragraph had been realized by the State's Attorney, he would have been quick to add an admonitory explanation, that no "threat" should be implied—that he was merely exhorting them to do their duty. The State's Attorney argues that the complained of language is precisely that—an adjuration to the jury to remember their oaths and to do their duty. We read it that way, too. We cannot, as defendant urges, equate "charge" with "prosecute," nor can we say that "misconduct" is a synonym for "crime," although the Criminal Code of 1961 discarded the various "feasances" and introduced "misconduct," as the descriptive word of various crimes relating to the performing of public responsibilities—such as that of jurors here. We doubt that present day jurors would understand it that way. "Charge" has various meanings—much broader than "prosecute." It can be equated with exhort or adjure. It is a synonym of "instruct." In the Federal practice, the court "charges" the jury. Maybe if this argument had been made in the 17th Century, a different and more dire meaning would

attach to it—but not today. We would be aghast to discover that this statement coerced a verdict. Being aghast, we cannot say that this was an error so plain and so destructive of substantial rights that a new trial should be had. Considering defendant's own testimony, the challenged part of the argument cannot be said to have been a material factor in his conviction. We are convinced that there was no intentional overreaching. As Judge Hand said in another case:

> "To seize upon it now, without any contemporaneous objection or exception, is quite unwarranted. It would almost certainly have been corrected. Few records could survive such scrutiny, and justice to the prosecution requires that what has once been accepted, shall not later be unraveled. In a very serious matter perhaps we might intervene even when the mistake would have been corrected, but the prejudice here was wholly inferential and speculative, and the guilt, clear." (United States v. Frankel, 65 F2d 285, 288 [2d Cir 1933]; cert denied 290 US 682 [1933]).

■■ The two remaining matters can be dealt with quickly. They deal with instructions that *were* objected to. An accomplice instruction, almost identical with the one recommended in IPI—Criminal (1968), No. 3.17, was given at the request of the State. It reads:

> "An accomplice witness is one who testifies that he was involved in the commission of a crime with the defendant. The testimony of an accomplice witness is subject to suspicion, and should be acted upon with caution. It should be carefully examined in light of the other evidence in the case."

The objection to this instruction is that the jury might have concluded that defendant fell within the definition of "accomplice" and therefore they would view his testi-

mony as suspect. Defendant sought an instruction which would differentiate his role as an alleged *defendant*-accomplice from that of a *witness*-accomplice.

 We find it hard to see how a jury would think of this defendant as one who testified that "he was involved in the commission of a crime with the defendant." After all, he was one of the three defendants and even the most naive of the jurors must have known that all three denied guilt. The very instruction itself makes it clear that an accomplice cannot be a defendant, the accomplice admits his guilt, a defendant by definition denies it. The instruction was proper and the one tendered properly rejected. Nothing was to be gained by an instruction stating that the defendants were not accomplices. The second instruction is also straight out of IPI—Criminal, No. 3.07:

> "You have before you evidence that the defendant confessed that he committed the crime charged in the indictment. It is for you to determine what weight should be given to the confession. In determining the weight to be given to a confession, you should consider all of the circumstances under which it was made."

Defendant argues that there was *no* confession—rather, what he told the police was a "statement," and that a statement is not an acknowledgment of guilt, whereas a confession is. This differentiation is correct. A confession is a comprehensive admission of guilt or of facts which necessarily and directly imply guilt. Defendant says that what he told the police was not a confession because he told the officer that he stood by while others entered the house and removed the television. But as we have seen from our discussion of accountability, one can stand off in the wings, as it were, and yet be held accountable for the action center stage. What he told the police was indeed a confession as we have just de-

fined it. There is a reasonable inference from what he told the police officer that he committed the crime with which he was charged. That his answers were not couched in the terms of the statutes on accountability or burglary is hardly remarkable—it would have been remarkable if they had been. The facts he recounted to the police reasonably and directly implied guilt, hence the characterization was proper.

██ ██ Defendant was fairly tried and fairly convicted. From the evidence a jury could rightfully and reasonably infer the requisite intent and, therefore, guilt. Simply because he denied such intent does not mean that triers of the fact are bound thereby. They had the right to opt otherwise and they did just that. In our opinion, the verdict was not forced nor did error intervene. The judgment is accordingly affirmed.

Affirmed.

TRAPP, J., concurs.

CRAVEN, P. J., dissenting.

CRAVEN, J., dissenting:
The State's Attorney, in his closing argument, used improper and prejudicial remarks which, in my view, constitute plain error affecting the substantial rights of the defendant. This error necessitates a remandment for a new trial.

As I understand the majority on this issue, they agree that the argument was improper but conclude that the prejudice was not such as to require a new trial in view of the evidence of guilt.

The prosecutor, in his closing argument, said:

"Everyone that is guilty of an act in violation of the law, stands in utter disregard for the law, that has

132

no respect for the law, that demonstrates that by their conduct, when that is brought to the jury's attention, a juror that fails to do anything other than to convict those individuals is guilty of a breach of trust, of misconduct as a juror. *And I would charge every one of you—each and every one of you with that offense if the verdict in this case were not guilty.* You would not be following the law, you would not be paying any attention at all to the evidence. I say that it isn't up to you to decide here today what the law should be. . . ." (Emphasis added.)

Any member of this jury could reasonably have understood from this argument that a not guilty verdict would result in a charge against the juror of misconduct as a juror. A verdict arrived at under such an apprehension, explicit or implicit, should not stand.

That which the Supreme Court stated in People v. Romero, 36 Ill2d 315, 223 NE2d 121 (1967), is applicable here. The court stated (at 320 (223 NE2d at 124)):

". . . we have often held, both in civil and criminal cases, that if 'prejudicial arguments are made without objection of counsel or interference of the trial court to the extent that the parties litigant cannot receive a fair trial and the judicial process stand without deterioration, then upon review this court may consider such assignments of error, even though no objection was made and no ruling made or preserved in the trial court.' (Citing cases.)"